May it please the court, opposing counsel. My client, Joe Maser, was shot not once, but twice with high-velocity rounds, fired by a police sniper who lost his composure. He by granting the shooter's motion for summary judgment, thereby denying Joe his day in court with the jury. Now this court, in this case, has an opportunity to revisit and affirm what is the law in this circuit with respect to the reasonableness, justification, if you will, for the use of deadly force. The district court, and this is notable, the district court indicated in its opinion, in its ruling, that we were to assume that Mr. Maser did not raise the rifle, and then turned around and said that he must have done something. Now, I look this up. Counsel, did the court find that he must have done something, or that he did do something with his right arm? Well, that's a key distinction, Your Honor. I tend to believe the language that was used is he must have done something. Otherwise, why would they have shot him? And that's really not any test at all. And I think the reason that we get to that is, in part, and bear in mind the definition of something is a thing that is unspecified or unknown. Used in various expressions indicating that a description or amount being stated is not exact. And I think what happened here is there's this line of cases. It starts with Partlow v. Statler. That's a 2014 case by your court, where it's subtle, but it seems to be a change from the normal standard or the prior standard, which was the reasonableness objectively under the circumstances, to a perception, a subjective perception of the shooter, which, again, is no test at all. When you couple that with having done something, I think this is an easy case for you. Counsel, would you agree that, given the threats that he had made and the fact he was carrying a gun, that if he made a menacing act, that there would be a reasonable use of lethal force? Well, as I remember the facts of this case, those threats were made inside the house. And so we have this whole time frame where he's in the house and they're trying to get him out and they keep badgering him to get him to come out. Were any of the threats made in the garage where the gun safe and all of that was located? No, Your Honor. And also key was there's nothing in the record that suggests that there were warnings, which is also a key distinction from some of these other cases. So he did something. What did he do? Well, we know that he stepped outside the garage. We do have video, though, don't we? We have video, but the video is inconclusive, which is why the district court said we have to assume he didn't raise the weapon. Our expert, our video expert, that the defendants did not rebut, they didn't provide their own expert. Video evidence was inconclusive and had also been manipulated. Well, the district court rejected that suggestion. They did, but I'm not sure that that was correct. I mean, I don't know how that even helps you here. I mean, the district court found that the video was inconclusive, right? You don't need to go further than that, do you? That's a fair assessment, Your Honor. I think the important thing is the court said we can assume that he did not, which takes it out of the realm of so many other cases in the circuit where you have someone making that threatening movement. Certainly, on one hand, on this side of the spectrum, somebody coming up and pointing a gun at a third party, police, whoever, and acting to go pull the trigger, that's justification. On the other hand, you have on this side where there's no justification, they just, you know, they shot him, okay? Cases are going to be in the middle, but what tends to go towards justification is you have that dangerous weapon being used, okay? It's being raised in a menacing fashion. You can't assume that here. District court said you can't assume that that happened, but he did something, and again, I'm not sure what that was. What do you do about Liggins v. Cohen, the case with the minor who pointed the gun or had the gun at the ground, and we held that it was objectively reasonable for the officer to shoot the minor? Your Honor, I don't believe that's our case. For one distinction, in Liggins, the suspect was running towards the officers, had been told to stop, refused to do it. And that's the distinction. We don't have that here, okay? We have walking out of the, I guess at best, he forcefully walked out. I don't know what that exactly means, but with a purpose, maybe. I don't know. Certainly, he was suicidal. Maybe he wanted to die that day, and that doesn't give law enforcement the rationale to shoot someone simply because they wanted to be shot. But Liggins didn't involve threats. We have three or four threats from your client, and I think that presents a difference that makes this more aggravated than the Liggins v. Cohen case. Sure, and again, those threats took place inside the house where there was no third parties. He was confined to the house until he was badgered into leaving. He was put up into a, he was, you know, law enforcement and the so-called negotiator kept aggravating him to get him to come out. There was really no reason to have him come out, and certainly not after what, I think it was 70 total minutes. Well, I was just going to follow up real quick with one thing, which is, take it from the viewpoint of a reasonable officer. I'm not a reasonable officer, but if somebody made a threat minutes earlier, walked out with an AR-15 towards me, I don't know, I kind of feel like that was threatening. And, you know, maybe you could make an argument that the officer shouldn't have shot, but at the same time, I'm not sure we can say that that violated a clearly established right. I mean, just look at it from the viewpoint, again, our framework is a reasonable officer. Well, I hope that's the case, because I think that favors us, okay? When you have that subjective perception of a threat, that's where it gets really murky, and I don't think we want to go down that road. Now, back to your question. We have cases where there's a, clearly, there's a weapon in somebody's hand. That does not give the court, that does not give law enforcement the license to shoot them, okay? I agree with that. So the threats, the threats are not contemporaneous with the coming out of the garage with a weapon, okay? They're not. So that's a distinction, okay? There was no commands to put down the rifle. We don't have that in the record, okay? In Liggins, there was the threat of a potential weapon because there was a report that it had been stolen. So I think the distinction with Liggins, back to your question, is the running, advancing towards law enforcement. If we agree with you that the conduct was objectively unreasonable, what case do you point us to for that right being clearly established? What's the best case that we can look to if we want to write an opinion in your client's favor? Judge, good question. The first case would be Partridge v. City of Benton. And there are two of those. There's one in 2019. These are Eighth Circuit cases. And then a follow-up in 2023. 2023 is a very good case for us. It has similar facts. And I'm reading from this court's ruling that in the district court, the granting of summary judgment was a usurpation of the jury function. That's really what we're talking about here. Because it's not that we don't have another avenue here. We can take it to the jury and they can decide whether the perception or whatever test you want to use was enough, okay? But here, and I'm quoting from Partridge, where the evidence does not indisputably establish where and how the suspect moved the gun as he was shot. Remember, we're assuming that he didn't. This court should not conclude without a trial that the suspect took a menacing action with a firearm that created an immediate deadly threat. So that case gets you past Wiggins, Your Honor. I think that case gets you past Wiggins. What was the basis of the district court's finding that your client did something with his arm? I mean, my recollection was it was based in part on kind of the contemporaneous reactions of the various officers. Was there anything else or if you can clear that up for me? I mean, when the district court said he did something, what was the basis for that finding? Sure. My review of that order, it appears to be that one of the officers ducked behind the vehicle and there's no proof of that. He makes that statement. Is that it? And I believe that's it. It's just him ducking behind. And because it's curious to me, you had the garage, if you will. Pretend that I'm Mr. Mazur. He had officers to the right of him and to the left that were just out of view on the corners of the houses. And you had squad cars. There were I don't know how many various police officers near the squad cars. And then you have the sniper who was across the street and down. If, in fact, the immediacy was so immediate, if you will, why didn't the law enforcement officers on the corners draw and fire? They were very close. I may be confusing my cases here. So we have a couple similar cases here. But didn't one of the officers testify that if there wasn't a shot, he would have fired? Or am I getting that confused? I don't recall that. But, again, that's after the fact. Well, I think it was submitted. It was a sworn statement that he also saw the threat, I thought. And had there not been gunshots, he would have fired at that point. Right. And we have cases where there's multiple shootings because no one wants to take that risk. If it's so immediate, OK, it would seem to me you're going to fire. Ask questions later. Right? Because you don't know. The point I'm making is even if he was pointing at somebody, no pun intended, who was in danger? There was nobody immediately in front of him. Again, if he had raised the rifle to someone clearly there in front of him and was about to shoot, he needs to be shot. We had to file this case, Your Honors, because we couldn't get Freedom of Information Act to get the videos. Wasn't there audio, though, to Judge Kobus' question? Was there audio from the officers talking about the threat? Again, I might be confusing the two cases because we have a very similar one. Saying, oh, no, he's got a gun or just that and the other thing. There is audio that makes that part of the puzzle. Again, it really doesn't help the analysis because the shooter was across the street, and I don't know whether he heard that information or not. And he was not, again, he was given the green light, if you will, to shoot at any time, it appears, because there was no one above him telling him, no, you can't shoot. But that would go to the reasonableness of the officer's actions. If somehow other officers heard that, then it would go, you know, hearing another officer in fear, perhaps, because of the gun, could it definitely influence fellow officers as well? So it starts to creep over to this line where we know it's clear that it was justified. But it's not enough. Again, your own precedent here in the Partridge case is you've got to do something threatening. Okay? We don't have anything like that. Again, the district court said we assume that he did not raise the gun. And you don't think, I'm still stuck on the threats, you don't think the threats, I know they're not contemporaneous, but it's not like they happened three weeks ago, right? I mean, they happened during the incident. You don't think that qualifies as menacing? Well, I don't think it qualifies, it's part of the puzzle. I think in totality of circumstances, again, it starts to move towards that line. But it's not definitive. Okay? We have trained these individuals, right? We give them weapons, and we expect them to use them in a way that's not indiscriminate. Again, he didn't raise the rifle. So where's the threat? You can't just shoot somebody even if they have a weapon on them. That's, I think, the real clear distinction here, Your Honor. Suppose, though, that he walks out and he goes, I'm going to shoot you all. Doesn't raise the gun. What is that? Do you think that that's menacing enough to grant qualified immunity? Good question. No. So next thing would be, it goes to another level, right? Drop the weapon. Get on the floor. He refuses. Keeps advancing. Drop the weapon. Get on the ground. He refuses. You do that enough times, you're running out of options, and therefore, you have to shoot him. That did not happen here. It didn't happen that way. Counsel, would you like to save the remainder of your time? I would, Your Honor. Thank you. Good morning. May it please the Court. Mr. Dothill. My name is Stephanie Hines, and I represent City of Coralville Officer, now Detective, Joshua Van Brocklin. I'd like to answer some of the questions that the Court just asked about the record evidence in the minutes just before Officer Van Brocklin shot Mr. Mazur. Yes, one of the officers standing right next to Officer Van Brocklin testified he would have taken the shot if Officer Van Brocklin had not. Were there threats? The minute before Mr. Mazur came out of his garage with his assault rifle, he made direct threats that he was unloading his gun safe. Now we're going to go. That was relayed to them. What do we make of this finding, though, this vague finding that District Court found, as a matter of fact, that something happened? I mean, my first question, is that a material finding? Is that important that we resolve that or not? Actually, you don't need to resolve that because under the long Eighth Circuit precedent, it's a constellation of events, the totality of the circumstances, that lead to the decision as to whether there's objective reasonableness in the officer believing that there was a threat of serious bodily harm to the officers or others, which is what we clearly have in this case. Counsel, must we assume that he did not move his arm? To me, that's significant. Must you assume that he did not move his arm? I don't think it's actually that significant whether he moved his arm or he didn't move his arm, but I would like to point out that five officers consistently and unanimously and unchanging with their testimony stated that they saw him raise his rifle. That's evidence, isn't it? Well, that's certainly evidence. And the only evidence that Mr. Mazur offers to combat that is inconclusive video. That's what his expert called it, inconclusive video. How would you describe what the video showed relative to the movement or no movement of the arm? I mean, what's your view of what that shows? Well, the district court found that there was a movement. He couldn't tell what the movement was precisely, but it's clear. Mr. Mazur admittedly was carrying an assault rifle when he exited his garage. He didn't drop it. He's moving with the assault rifle, comes out of the garage. He even testified during his deposition. He had the assault rifle in his right hand. He comes out of the garage, and he looks side to side. He testified he looked side to side looking for the police as he came out of the garage with the assault rifle. He'd already threatened them right before that what he was going to do, unloading his safe. What was the time separation between the shots and the last threat? Do you recall what the record shows? A few seconds. He was making threats on the phone to the negotiator. At that point, the incident commander tells all the officers on the radio, move back further than you were before, before the officers even had an opportunity to do that. That's when Mr. Mazur raises the double garage. In fact, of his three-stall garage, he had shut the garage doors, and he couldn't see, so the officers couldn't see what he was doing. The officer, Officer Van Brocklin, across the street, had seen him just before that move to his gun safe. The garage doors closed, changing the situation so the officers are thinking ambush, possibly. And then he opens the garage and immediately comes out with the assault rifle. The officers all knew that the gun safe was in the garage. There were six to seven guns in the gun safe and that he'd already used a gun earlier that morning. The first report from the 911 call that came in was that he was intoxicated, he was suicidal, and he had discharged a weapon inside his home into the ceiling. When the officers got there five minutes later, excuse me, a few minutes after that when they responded, they heard two more gunshots in the neighborhood outside in the vicinity of Mr. Mazur's home. It was already a dangerous situation at that point. From there, we go to the negotiator trying to get Mr. Mazur to come out safely, working with him, asking him to come out without his guns. Mr. Mazur, he vacillates. At one point, he's calm. At another point, he's despondent. At another point, he's hostile. At one point, he tells the negotiator that he would come out of his house but through the garage where his gun safe was and not empty-handed. Suppose we have the same facts except for one thing. We have no threats whatsoever. So you could just imagine discharge of a weapon inside, intoxicated. Somebody walks out with an AR-15. Let's suppose it's pointed to the ground, makes some sort of movement. We don't know what the movement is. Officers fire with no warning. Is that fine? Is that objectively reasonable? Well, first of all, this is not – I appreciate you're hypothetical, but this case is not that case. This case is not Partridge v. City of Benton. This case is not Crook v. Evans, both cases cited by Mr. Mazur, where mere possession of the gun is what the officers were dealing with. And so the question was, what movement was made with the gun? Well, I'm trying to figure out what's important here. I'm actually not trying to ask a trick question or anything like that. I'm just trying to figure out what's important. How important are the threats to the analysis? I get it that there's other facts here, but it's going to be a continuum, right, between somebody who's really threatening who the officers fear and somebody who just possesses the gun. I'm just trying to figure out at what point does it cross the line. And for me, the threats seem to be pretty important. And I agree with you, Your Honor. They are important, and there's no dispute, not one dispute, as to the threats were made. This entire incident from when the first phone call connected with the negotiator to Mr. Mazur was recorded on audio. The entire conversation, everything that Mr. Mazur said is recorded. It's not disputed what he said. It's not disputed that he made threats. It's not disputed that he was angry. It's not disputed that he was hostile. In fact, the last three minutes right before he came out of his garage with the assault rifle is a barrage of profanity at, and I'm not saying that profanity justifies what happened, but a barrage of profanity directed at the officers. If I actually read the transcript of what was said those last three minutes, it's pretty disturbing. It's in the record. So how important is it that he was intoxicated? Is that pretty important to the analysis? And that they had a report that he was intoxicated, not just they had guessed that he was intoxicated. The report that he was intoxicated came from a credible source. It came from his ex-fiancee, who's the one who initiated the 911 call that morning. So they knew that he was intoxicated. I would say he was a somewhat functional, apparently intoxicated person because he was able to carry on a conversation. But that intoxication contributed to the officers reasonably believing that Mr. Mazur was erratic, which he was. It wasn't that he just consistently, for example, in Crook v. Evans, where the subject is calm other than being suicidal, which I'm not saying that being suicidal is a calm situation, but the entire time he's telling the officers, I'm not going to hurt you. And he only has the gun pointed to his head the entire time. Which gets me back to my, this all gets me back to my original question, which is intoxicated guy walks out, all the same facts, no threats. Does that, where is that on the line? Do you think that's a really close call? Do you think the officers would still have, would still be justified in shooting them? I'm just trying to figure out where the line is. I don't think that you have to draw a line in this case because we're not dealing with those facts. Another case perhaps that comes up, I'm happy to argue that, make that argument, but I don't think it's as relevant in this case because there were threats. There was intoxication. There was hostile statements that, there were hostile statements that were made. And everything together, the totality of the circumstances in this case, sets us apart from the cases that Mr. Mazur is relying on like the Partridge case. If you don't have the threats, we might have a closer call. But this isn't a close call. And in fact, when this lawsuit was first filed in May 2021 in state court, the claims were made based upon Mr. Mazur's unhappiness with how the negotiator handled the situation asking him to come out unarmed. Unhappy with the fact that what he called was a significant police presence in his neighborhood. His claims at that time were for assault, battery, negligence, intentional infliction of emotional distress. There was no Section 1983 excessive force claim. That didn't happen until almost two years later after the defendants had filed a motion for summary judgment on the basis of Iowa law that immunizes law enforcement officers from conduct taken in connection with an emergency response, which this clearly was. How long before, this is my last question, how long before the firing on Mr. Mazur were the gunshots? I know that there was one inside the house, so how long between the initial report of the gunshot and firing upon Mr. Mazur? And then there were two you mentioned, I think, that were outside. How long between those? The first gunshot, we're not sure what time that happened. It was reported in a 911 call that was about 15 minutes before 10 a.m. on the morning of this incident. The officers respond, and within five minutes they hear two gunshots very close together. And then it was approximately 45 minutes of negotiations from the second, or gunshot two, gunshot three, 45 minutes, in which case it wasn't just a, well, there's a drunk guy here who's shooting his gun. And by the way, this was a residential neighborhood. It was five months into COVID. The neighbors on the left side were home. The neighbors on the right side were home. The neighbors across the street were home. There were pedestrians. There were people on bikes. There were kids playing. This was a dangerous situation, warranting, I would say, the police presence to protect the people around from a drunk suicidal person with a gun. Ms. Hines, could you address the argument that the two gunshots should be bifurcated for purposes of our reasonable use of force analysis? Do you mean the two gunshots not being by Mr. Mazur earlier that morning, but Mr. Rothman's two gunshots? Yes. Those gunshots happened immediately. It was bang, bang. It wasn't one gunshot, wait to see what happens, second gunshot. They were immediate. They were less than a second. They were bang, bang, just like that. Regarding the other evidence that Mr. Mazur states wasn't present in the record, there is video of Lieutenant Clairhan on the scene from behind his squad car, and he's watching the scene two doors down. And when he saw Mr. Mazur come out with the gun, he says right on the audio, long gun, long gun. And then Mr. Mazur goes back in the garage, and four seconds later comes back out more quickly, and then you see on the video Lieutenant Clairhan immediately ducking, and he testified it was for fear that he was going to be shot because from his vantage point, Mr. Mazur was pointing the gun his direction. There are actually two officers even closer than Lieutenant Clairhan. They were in the driveway immediately next door to where Mr. Mazur's house was. When Mr. Mazur did come out of the house, which was just before 11 a.m. and finally after a lot of working with Mr. Mazur, the negotiator persuades Mr. Mazur to exit the house. He gives him explicit instructions. Come out of the house unarmed, nothing in your hands other than your cell phone. Let me know when you're coming out because there are officers out there, and we don't want the officers to be surprised. Mr. Mazur comes out of the house, but he moves his hands toward his waist. Officer Van Brocklin across the street clearly sees this, and he yells to Mr. Mazur, Mr. Mazur, put your hands up. Put your hands up, please. The officer's next door. One also gives the same command. Meanwhile, there's another officer right next to him. He's behind a shield, and he points his weapon because the officers don't know if Mr. Mazur, who they know owns guns, who they know has already probably discharged at least his gun twice near the house, plus the one before that, if he has a gun. One officer points his weapon. The others tell him to put his hands up. What does he do? He doesn't put his hands up to show that he's not a threat. He turns to the officers toward the right, and he flips them off, and he says, fuck you, and he goes back in the house. It was three minutes immediately after that when he's engaging in the conversations with the negotiator on the phone as to his anger at having been asked to put his hands up. This isn't a case where there wasn't a warning. In fact, when he came out with the assault rifle from his garage, that was his response to escalate matters. The officers next door told him, commanded him, put the gun down. Put the gun down. It's on the audio. It's testified by the officers. He doesn't put the gun down. Instead of putting the gun down and complying with the officer's commands, he comes back out a second time and looks toward those officers, and the officers perceive him raising the weapon. We don't even need to show, though, that that weapon was raised. There's a long, abundant history of case law in the Eighth Circuit that you don't need to actually see the gun raised for there to be a reasonable belief that the person was an imminent threat of serious bodily harm. We've got cases like Loxley v. City of Litchfield. There wasn't even a gun seen, and it was found that it was objectively reasonable when the officers had been told the subject had a gun, and the subject used the word kill, came toward the officers, and he slipped and his hand moves toward his waist, and the officer shoots him, and the court found that was objectively reasonable and affirmed qualified immunity. We have other cases like that as well. Many cited in our record showing that you don't need in this situation, with threats, with hostility, with erratic behavior, with a gun having been shoved previously, that it was objectively reasonable for the officers to fear that there was serious bodily harm about to happen from a man with an assault rifle in this situation. I would ask that the court affirm the district court's ruling, applying qualified immunity. Thank you. Thank you. Two quick points. One, our expert videographer, Matt Gabler, noted that the audio and the video did not sync. The audio of Clarion, so anything that was said, it doesn't sync with the videos. So he put together all the videos together, and they don't sync up. So that raises a disputed fact as to whether the timing of Mr. Mazur coming out and told to. I'm not aware of any information that states that he definitively was told to put down the weapon. But regardless, the timing doesn't sync up. The other important thing I want you to consider is there was a charge. Trial information is what we use in Iowa. There was a charge against Mr. Mazur for assault while carrying a dangerous weapon. That was dismissed for lack of evidence. That's a huge fact that moves this back towards that continuum towards not being justified. So again, we'd have you reverse the district court's ruling. Thank you. Thank you. Thank you.